**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| SCHLUMBERGER TECHNOLOGY CORP., SMITH INTERNATIONAL, INC., and SPECIALISED PETROLEUM SERVICES GROUP LTD. )<br><br>Plaintiffs,<br><br>v.<br><br>BAKER HUGHES INC.,<br><br>Defendant. | Case No. 4:12-cv-3573<br><br>JURY TRIAL REQUESTED |

<u>**ORIGINAL COMPLAINT**</u>

Plaintiffs Schlumberger Technology Corp., Smith International, Inc., and Specialised Petroleum Services Group Ltd. file this Original Complaint against Defendant Baker Hughes, Inc. for patent infringement, breach of contract, and fraud in the inducement, and seek actual damages, exemplary damages, rescission, and injunctive relief as set forth below.

## I.    PARTIES

1.    Schlumberger Technology Corporation ("Schlumberger") is a corporation organized under the laws of the State of Texas, with its principal place of business in the United States located in Sugar Land, Texas.

2.    Smith International, Inc. ("Smith") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Houston, Texas.  Smith and Schlumberger share common ownership.

3.    Specialised Petroleum Services Group Ltd. ("SPS") is a limited company incorporated in Scotland, with its principal place of business located in Aberdeen, Scotland.  SPS and its parent company, M-I LLC, share common ownership with Schlumberger.

4.     Baker Hughes Incorporated ("Baker Hughes") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Houston, Texas.

## II.   NATURE OF THIS ACTION

5.     This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, and in particular 35 U.S.C. §§ 271 and 281-285.

## III.   JURISDICTION AND VENUE

6.     This Court has exclusive subject matter jurisdiction over this patent action under 28 U.S.C. §§ 1331 and 1338(a), and has supplemental jurisdiction over the pendent contract and fraud in the inducement claims (which are part of the same controversy) under 28 U.S.C. § 1367.

7.     Baker Hughes is subject to personal jurisdiction as it is a resident in the State of Texas, and the Southern District of Texas in particular.

8.     Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

## IV.   BACKGROUND COMMON TO ALL CLAIMS

9.     Technology is increasingly critical to the oilfield exploration and production industries, particularly as new fields are being developed in deeper, harsher, and more challenging areas, and as existing fields have matured.

10.     Schlumberger satisfies this critical need, supplying the oilfield industry with advanced technologies in equipment, services, and information solutions.

11.     Baker Hughes seeks to compete with Schlumberger, but faces a widening technology gap between itself and Schlumberger.  In 2011, Schlumberger invested almost $1.1 billion in research and development for its oilfield activities, roughly equal to the investment of the three closest oilfield service companies combined.  Not surprisingly, the United States Patent

and Trademark Office ("USPTO") granted almost twice as many U.S. Patents to Schlumberger in 2011 as it granted to Baker Hughes that year.[1]

12.     Baker Hughes' management stated that in the past several years it "transformed the company into a formidable competitor in the oilfield services sector."[2]  Unfortunately, this attempted transformation has been founded on patent infringement and breach of agreements.

**A.      The Patent Dispute Resolution Agreement**

13.     At various times throughout the history of Baker Hughes and Schlumberger, disputes have arisen regarding infringement of the parties' patents.

14.     In an attempt to streamline the dispute resolution process for certain existing and future patent disputes, Schlumberger and Baker Hughes negotiated terms of a Patent Dispute Resolution Agreement (the "Resolution Agreement") and a Patent Dispute Procedure Agreement (the "Procedure Agreement").

15.     Schlumberger agreed to forego certain remedies available at law, including appellate rights, in exchange for what Schlumberger believed to be the swiftness and certainty of resolution afforded under the Resolution Agreement.   Specifically, a stated intent of the Resolution Agreement was to address and resolve certain defined "Current Disputes" and to provide a process for resolving future patent disputes through the use of alternative dispute resolution (as opposed to district court litigation).[3]

16.     The Resolution Agreement and the Procedure Agreement were signed on behalf of both Schlumberger and Baker Hughes on May 20, 2009.

---

[1]     Schlumberger and its related entities, Smith International Inc., WesternGeco LLC, and M-I LLC, were issued 598 U.S. Patents in 2011, compared to Baker Hughes' 332.  *Patenting by Organizations 2011*, United States Patent and Trademark Office (Mar. 27, 2012), http://www.uspto.gov/web/offices/ac/ido/oeip/taf/topo_11.htm#Desc and search regarding M-I.

[2]     Baker Hughes 2011 Annual Report.

[3]     The Resolution Agreement specifically lists included and excluded technology areas, leaving the parties free to litigate patent disputes related to the excluded technologies.

17.     The Resolution Agreement provides that any current or future Disputes shall be solely resolved as set forth in an incorporated Procedure Agreement.

18.     The Procedure Agreement lays out a specific set of procedures and a timeline for resolving patent disputes.  This was at the heart of what Schlumberger bargained for; an efficient patent dispute resolution procedure that would be followed by Baker Hughes.

19.     The Procedure Agreement provides that a party asserting a patent infringement claim will send a written Dispute Notice, with a clear and plain statement of the Dispute, identify the asserted patent(s), and include a claim chart identifying the claims believed to be infringed, the grounds for that belief, and the elements of the alleged infringing product or service that constitute infringement.

20.     After receipt of a Dispute Notice, strict deadlines are imposed for substantive written responses, an in-person meeting, arbitration demand, discovery, briefing, a mini-trial, and mediation, all leading to an arbitration within 440 days after the demand.

21.     In sum, the parties contracted to resolve patent disputes quickly after a Dispute Notice, whether through correspondence, in-person meetings, mediation, or arbitration. However, what looked then to be an inviolate contract for resolving disputes is now a Baker Hughes prop to prolong disputes and prevent resolution.

**B.     Baker Did Not Intend to Abide by the Resolution Agreement**

22.     In hindsight, it appears that even during the negotiations Baker Hughes was not actually seeking a procedure to efficiently resolve disputes, but was simply trying to access Schlumberger's technology with reduced risk, and to delay being held accountable when improperly using Schlumberger's technology.

23.     During the negotiations, Baker Hughes was reluctant to agree to any of Schlumberger's royalty rate proposals, and repeatedly pressed for less egregious remedies.

24.     Baker Hughes wanted to stagger the resolution of existing disputes to no more than one per year, despite the fact that there were a multitude of outstanding disputes at the time that the parties entered into the Resolution Agreement, including nine "Current Disputes" explicitly identified and governed by the Procedure Agreement.

25.     Baker Hughes removed a provision from an early Schlumberger draft that would have penalized delays, and removed a "loser pays" provisions on attorneys' fees as well.

26.     Nevertheless, Schlumberger accepted all the compromises made in the final negotiations, including the agreed remedies, because it expected Baker Hughes was sincere in its intent to swiftly resolve disputes and abide by the signed contract.  This has not been the case.

### C.     Baker Hughes' Repudiation and Material Breaches

27.     In bad faith, Baker Hughes has made intellectual property disputes more lengthy, expensive, and complicated than they would have been in district court, undermining at every opportunity the benefit that was bargained for in the Agreements.   Baker Hughes falsified defenses, twisted the agreements to apply one way to Baker Hughes and the opposite way to Schlumberger, and created satellite litigation (thereby thwarting the very purpose of submitting to a sole, alternative forum).   In the final and ultimate act of faithlessness to the contract, Baker Hughes has now simply refused to acknowledge the existence of a dispute, in order to prevent any resolution.   This was the straw that broke the Agreements' back.

### 1.     Baker Hughes Fabricated Positions to Delay and Increase Costs

28.     On February 16, 2010, Schlumberger sent a Demand for arbitration alleging infringement of Canadian Patent No. 2,389,419 by Baker Hughes' Centrilift pump system.

29.     Rather than address the infringement allegations substantively, as required by the Procedure Agreement, Baker Hughes knowingly made a false argument that Schlumberger had stolen the idea for the patented technology through a former Baker Hughes employee.

WS01406445-5-

30.     After forcing the parties to institute formal arbitration and requiring discovery on this specious defense, the witness Baker Hughes offered to support this defense testified that he had absolutely no evidence, and had previously retracted even his suspicion.

31.     Thereafter, Baker Hughes agreed to settle the dispute, having never provided any evidence to support this defense and needlessly running up the cost of the dispute.

### 2.  Baker Hughes' Unequal and Improper Application of The Resolution Agreement

32.     After the Resolution Agreement was executed, Schlumberger sent a Dispute Notice asserting that Baker Hughes infringed U.S. Patent No. 6,026,897 ("the '897 Patent").

33.     Baker Hughes responded that infringement of the '897 Patent was raised prior to the execution of the Resolution Agreement, yet was not included as a "Current Dispute."  As such, Baker Hughes argued that the '897 Patent infringement dispute was either (1) settled and resolved by the Resolution Agreement, (2) resolved by operation of the Resolution Agreement because Schlumberger had not brought a demand for arbitration within an agreed time period from the pre-Resolution Agreement infringement letter, or (3) it had been waived because it was not included in the list of Current Disputes.

34.     Despite its arguments to the contrary, Baker Hughes subsequently sought to raise a dispute regarding alleged infringement of Baker Hughes' U.S. Patent No. 6,412,562 ("the '562 Patent") which was also the subject matter of an infringement letter sent prior to the execution of the Resolution Agreement.

35.     Baker Hughes' inconsistent treatment of the '562 and '897 Patent disputes exposes Baker Hughes' *only when helpful to me* intent in acting under the Resolution Agreement.  This manufactured flexibility makes the contract worthless to Schlumberger.

WS01406445-6-

### 3.   Baker Hughes Created Untenable Positions, Satellite Disputes, and Litigation, All To Create More Delay

36.     At the time the parties signed the Resolution Agreement, one ongoing "Current Dispute" listed in the agreement was the alleged infringement of four Schlumberger patents by Baker Hughes' RCI/SampleView/IFX technologies.[4]

37.     Toward the end of the arbitration process, Baker Hughes slipped into its expert report an argument for license and release based on an unrelated 2004 settlement agreement.[5] Baker Hughes then improperly sought to start a separate satellite arbitration on this "new" defense – despite its 2009 agreement defining RCI/SampleView/IFX as a Current Dispute governed by the Resolution Agreement.  This was another delay and cost-increase ploy.  If this was a meritorious defense, it would have been asserted by Baker Hughes during the prior seven years of the dispute, or, at the very least, Baker Hughes would not have agreed to have the claim made subject to the 2009 Resolution Agreement.

38.     Baker Hughes then sued in state court to compel the satellite arbitration, ignoring a ruling by the existing arbitration panel that made clear that the license and release defense was properly before that current arbitration panel that had been convened for almost six months, had heard testimony, and had provided a Markman ruling.  The state court ordered Schlumberger to participate in the satellite arbitration, but shortly thereafter, the Court of Appeals held that the existing arbitration panel had the authority to decide its own jurisdiction over this issue.

---

[4]     This dispute, which initially began in 2003, was the exemplar for why Schlumberger insisted on definitive time tables for reaching resolution.  Prior to the execution of the Resolution Agreement, the matter had dragged on unresolved for more than six years.

[5]     This is further evidence of Baker Hughes' opportunistic "when it suits my purposes" application and total frustration of the Resolution Agreement.  As to Schlumberger's '897 patent referenced above, Baker argued it was released because it was not listed as a Current Dispute; as to RCI/Sampleview/IFX, Baker Hughes argued this was also released despite being specifically listed as a Current Dispute.

39.     In April 2012, approximately nine years after the commencement of the initial dispute, and after causing significant and unnecessary costs through forum-shopping a frivolous defense, Baker Hughes agreed to settle the dispute.

**4.   The Final Breach – Refusing To Acknowledge A Dispute Notice**

40.     On June 17, 2010, Schlumberger sent a Dispute Notice, alleging infringement of United States Patent No. 5,515,038 ("the '038 Patent") including an infringement claim chart as required by the Procedure Agreement.  This act by Schlumberger triggered the requirement of a substantive response from Baker Hughes.

41.     Instead of providing a substantive response, Baker Hughes wrongly sidestepped the Notice, complaining it did not *establish* infringement (which is not the point of a "Notice"). In this regard, Baker Hughes alleged that Schlumberger had not shown where the "digital data transmission" limitation of the '038 claims is present in the accused Centinel System, despite its presence in the claim chart.

42.     Schlumberger timely replied that the alleged missing elements were set forth in the claim chart *and* were admitted in Baker Hughes' own literature.  Baker Hughes never denied that the elements were present, but continued to allege faults in the sufficiency of Schlumberger's proof, a substantive issue to be resolved during a dispute but never a requirement for *notice* of a dispute.  Schlumberger repeatedly invited Baker Hughes to respond substantively, noting that Baker Hughes could have determined if the accused elements were present or absent in its devices, but Baker Hughes refused to do so.

43.     Baker Hughes has refused to move the dispute forward under the timeline of the Procedure Agreement, deferring movement by sending only paltering, non-substantive letters. As recently as September 25, 2012, Baker Hughes refused to acknowledge a dispute even existed

and would not even confirm that the Centinel System includes "digital data transmission," or that there is even a "data transmission assembly."

44.     Yet Baker Hughes' own marketing literature (sent with the Dispute Notice) belied this position the company has consistently taken to avoid addressing this patent dispute. Even today, the Centinel System brochure, shown at right and available on the company website, states that a downhole sensor is part of the Centinel System, and that "[t]he down-hole sensor offers digital data transmission . . . ."  Moreover, this is specifically the type of issue (what features the product does or does not contain) that was contemplated to be discussed and resolved in the required business-to-business meetings—but Baker will not let the agreed resolution process be applied to this matter.

45.     Baker Hughes' position that Schlumberger's claim chart is insufficient is not only wrong, but is also contrary to the course of dealing of the parties.  In fact, Schlumberger has received and accepted claim charts prepared by Baker Hughes that are no more detailed.

46.     Through this gamesmanship, Baker Hughes has avoided addressing this issue for more than two years.  If the procedure agreed upon by the parties was followed by Baker Hughes, the '038 Patent dispute would be well on its way into the arbitration process; yet, Baker Hughes has stymied the process to the point that now, twenty-nine months after the original notice, Schlumberger cannot yet request arbitration.[6]

47.     Baker Hughes' refusal to acknowledge the Dispute Notice is a material breach.

---

[6]         As Baker Hughes is keenly aware, the patent at issue in the dispute expires in eleven months.  Baker Hughes' refusal to acknowledge the dispute can only be seen as a bad faith attempt to "run the clock out."

48.     The Resolution Agreement provides a process for notice and cure of a breach. Accordingly, Schlumberger provided written notice of breach on October 9, 2012.

49.     Baker Hughes allowed the cure period to run without taking any steps to remedy the breach or to perform its obligations.[7]   Instead, Baker Hughes suggested a lengthy new process for negotiation among attorneys as to whether a dispute even exists, essentially seeking to rewrite the agreement of the parties.  This is antithesis of the parties' contract—proposing new layers of complexity and having lawyers as gate-keepers to the business decision makers, thus paving new avenues of delay.

### D.     Baker Hughes' Material Breaches Have Left The Patent Dispute Resolution Agreement Irreparably Broken

50.     The above are just some examples of the bad faith conduct of Baker Hughes.  As shown by its actions following the Agreements' signing, Baker Hughes never truly intended to swiftly identify and resolve disputes, but actually intended to *avoid* resolution (and the related royalty obligations) while being a fast follower of Schlumberger's advanced technologies to close the widening technology gap.

51.     In view of Baker Hughes' repeated and material breaches, the Resolution Agreement has been frustrated to the point where it must be rescinded.  Legitimate allegations of potential infringement remain outstanding, and Schlumberger now turns to this Court to seek redress.

### V.     FIRST CLAIM – INFRINGEMENT OF U.S. PATENTS 6,732,817 and 7,314,099

52. On May 11, 2004, U.S. Patent No. 6,732,817 (the '817 Patent") was duly and legally issued by the USPTO to Charles Dewey and Wei Xu.  A true and correct copy of the '817 Patent is attached as Exhibit A.  The '817 Patent is presumed valid pursuant to 35 U.S.C. § 282.

---

[7]      Baker Hughes could have cured its breach by simply acknowledging the dispute and seeking to schedule a business to business meeting in accordance with the provisions of the Procedure Agreement.

53. On January 1, 2008, U.S. Patent No. 7,314,099 (the '099 Patent") was duly and legally issued by the USPTO to Charles Dewey and Wei Xu.  A true and correct copy of the '099 Patent is attached as Exhibit B.  The '099 Patent is presumed valid pursuant to 35 U.S.C. § 282.

54. The '817 Patent and '099 Patents are directed generally to expandable reamers for enlarging boreholes.  Pursuant to the Resolution Agreement, formation cutting devices, "including but not limited to . . . reamers," which the '817 and '099 Patents cover, are an Excluded Technology and thus not subject to the Resolution and Procedure Agreements.

55. Smith is the owner by assignment of all right, title and interest in the '817 and '099 Patents.

56. Baker Hughes makes, uses, sells, and/or offers to sell the GaugePro Expandable Reamer.

57. Baker Hughes has been, and still is, infringing one or more claims of the '817 and '099 Patents by making, using, selling and/or offering to sell the GaugePro Expandable Reamer.

58. Baker Hughes also has been, and continues to induce infringement of, and contribute to the infringement by its customers who directly infringe the '817 and '099 Patents through their use the GaugePro Expandable Reamer.

59. The product, as sold and offered for sale by Baker Hughes, has no substantial non-infringing uses.

60. Baker Hughes specifically intended that their customers infringe the '817 and '099 Patents, and that their acts would constitute infringement.

**VI.   SECOND CLAIM – INFRINGEMENT OF U.S. PATENT 6,152,220**

61.   On November 28, 2000, U.S. Patent No. 6,152,220 (the '220 Patent") was duly and legally issued by the USPTO to Mark Carmichael for a down-hole tool with centralizing

WS01406445-11-

component.  A true and correct copy of the '220 Patent is attached as Exhibit C.  The '220 Patent is presumed valid pursuant to 35 U.S.C. § 282.

62.     The '220 Patent is directed generally to equipment used in the displacement and cleaning of wellbore fluids.  Pursuant to the Resolution Agreement, drilling fluids including "processes and equipment used in the displacement, remediation [and] cleaning . . . of such fluids and particulate matter derived from penetrating earth formations," which the '220 Patent covers, is an Excluded Technology and thus not subject to the Resolution and Procedure Agreements.

63.     SPS is the owner by assignment of all right, title and interest in the '220 Patent.

64.     Baker Hughes makes, uses, sells, and/or offers to sell the X-Treme Clean XP Wellbore Clean Up Tool ("X-Treme Clean Tool"), which is covered by one or more claims of the '220 Patent.

65.     Baker Hughes has been, and still is, infringing one or more claims of the '220 Patent by making, using, selling and/or offering to sell the X-Treme Clean Tool.

## VII.  THIRD CLAIM – BREACH OF CONTRACT

66.     The Resolution Agreement and the Procedure Agreement are valid, enforceable contracts.

67.     Schlumberger and Baker Hughes are the signatories and contracting parties under the Resolution Agreement and the Procedure Agreement.

68.     Schlumberger performed all of its obligations under the Resolution Agreement and the Procedure Agreement.

69.     Baker Hughes materially breached the Resolution Agreement and the Procedure Agreement.

70.     Baker Hughes' material breaches include its failure to perform the fundamental promise of the Resolution Agreement – that it would resolve patent disputes according to the procedure agreed upon by the parties.  As such, Schlumberger was denied the expected benefit of the contract.

71.     In addition, Baker Hughes materially breached the provision of the Procedure Agreement that requires at least one in-person meeting, and a good faith negotiation as to the '038 Patent infringement claim.

72.     Baker Hughes' material breaches also include its failure to cure its breach as allowed by the Resolution Agreement, despite specific notice by Schlumberger.

73.     Baker Hughes also materially breached the contract by making performance by either party impossible.  Specifically, by repeatedly refusing to acknowledge that Disputes exist when provided with the necessary notice, Baker Hughes has prevented such disputes from moving toward resolution without litigation.

74.     Baker Hughes' breaches have caused damage to Schlumberger.

75.     Schlumberger is excused from further performance under the Resolution Agreement and Procedure Agreement due to the material breaches by Baker Hughes.

### VIII. FOURTH CLAIM – INFRINGEMENT OF U.S. PATENT 5,515,038

76.     On May 7, 1996, U.S. Patent No. 5,515,038 (the '038 Patent") was duly and legally issued by the USPTO to Alistair Smith for a data transmission system.  A true and correct copy of the '038 Patent is attached as Exhibit D.  The '038 Patent is presumed valid pursuant to 35 U.S.C. § 282.

77.     The '038 Patent was reexamined by the USPTO, and a reexamination certificate was issued on December 13, 2011, confirming the validity of the '038 Patent without any substantial amendment.  A copy of the reexamination certificate is attached as Exhibit E.

WS01406445-13-

78.     Schlumberger is the owner by assignment of all right, title and interest in the '038 Patent.

79.     Baker Hughes makes, uses, sells, and/or offers to sell the Centrilift Centinel Monitoring and Automation System ("Centinel System"), which is covered by one or more claims of the '038 Patent.

80.     Baker Hughes has been, and still is, infringing one or more claims of the '038 Patent by making, using, selling and/or offering to sell the Centinel System.

81.     Baker Hughes' infringement has been willful, at least since June 18, 2010, when Baker Hughes received Schlumberger's notice (including detailed claim charts) of infringement.

## IX.   FIFTH CLAIM – FRAUD IN THE INDUCEMENT

82.     During the negotiations of the Resolution Agreement, Schlumberger had concerns that Baker Hughes would delay the resolution of patent disputes, and thus inserted in the first draft term sheet that "[t]he final agreement will include a detailed ADR agreement with penalties if a party does not meet mandatory negotiating deadlines."

83.     Baker Hughes removed the penalty provision.

84.     When Schlumberger expressed concern, and indicated it wanted to avoid a situation where a party could simply ignore the deadlines, Baker Hughes, through an employee acting within the scope of his employment, represented that Baker did not anticipate any such situations.

85.     Baker Hughes' representation was material to Schlumberger because a primary goal of the contract for Schlumberger was an efficient method to resolve disputes.

86.     Further, while working out the terms of the Procedure Agreement, Baker Hughes stressed that the Resolution Agreement was solely a set of procedural rules for the parties to follow and a process for resolving disputes.

WS01406445-14-

87.     Baker Hughes' representations regarding the Resolution Agreement and not anticipating any delay in the future were false, and Baker Hughes knew they were false when the representations were made, because the same individual who negotiated the Resolution Agreement is in charge of addressing Disputes – and has implemented Baker Hughes' strategy of more delay than resolution.

88.     Baker Hughes falsely promised that it would perform and follow the agreed process to resolve patent disputes, but never intended to perform as to all disputes.

89.     Baker Hughes intended, and had reason to expect, that Schlumberger would enter the Resolution Agreement and agree to an arbitration process without penalties and with reduced recoveries, rather than litigate in federal district court, based upon the representations and false promises of performance.

90.     Schlumberger relied upon these representations to its detriment, and signed the Resolution Agreement and the Procedure Agreement giving up many of the rights and remedies it would otherwise have in a federal district court.

91.     Schlumberger is entitled to rescission of the Resolution Agreement and of the Procedure Agreement.

## X.     PRAYER FOR RELIEF

WHEREFORE, Schlumberger prays for judgment and seeks relief against Baker Hughes as follows:

(a) For a judgment that one or more claims of the '817, '099, '220 and/or the '038 Patents have been and continue to be infringed by Baker Hughes;

(b) For a judgment and an award of all damages sustained by Schlumberger, Smith and SPS as the result of Baker Hughes' acts of infringement, including

supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting as needed;

(c) For a permanent injunction enjoining Baker Hughes from infringing any claims of the '817, '099, '220 and/or the '083 Patents;

(d) For a judgment and an award of enhanced damages for willful infringement of the '083 Patent pursuant to 35 U.S.C. § 284;

(e) For a judgment and an award of attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

(f) For a judgment and an award of all interest and costs;

(g) For a judgment of rescission of the Resolution Agreement and the Procedure Agreement based upon Baker Hughes' material breaches and/or fraud in the inducement, or, in the alternative, for a judgment that the contract is cancelled and Schlumberger is excused from further performance;

(h) In the alternative, for a judgment and an award of damages based upon Baker Hughes' material breaches of the Resolution Agreement and the Procedure Agreement, and Fraud in the Inducement; and

(i) For a judgment and an award of such other and further relief as the Court may deem just and proper

## XI.   JURY DEMAND

Schlumberger, Smith, and SPS demand a trial by jury.

Dated:  December 7, 2012

Respectfully submitted,

_/s/ John R. Keville_____

John R. Keville
Attorney-in-Charge
Texas State Bar No. 00794085
S.D. Tex. Bar No. 20922
jkeville@winston.com
Tyler T. VanHoutan
Texas State Bar No.
S.D. Tex. Bar No. 30827
tvanhoutan@winston.com
Donald H. Mahoney III
Texas State Bar No.
S.D. Tex. Bar No. 1496443
tmahoney@winston.com
Erin C. Villaseñor
Texas State Bar No. 24072407
S.D. Tex. Bar No. 1114483
evillaseñor@winston.com
WINSTON & STRAWN LLP
1111 Louisiana, 25TH Floor
Houston, TX  77002
Telephone:  (713) 651-2600
Facsimile:  (713) 651-2700

**ATTORNEYS FOR PLAINTIFFS,
SCHLUMBERGER TECHNOLOGY CORP.,
SMITH INTERNATIONAL, INC., and
SPECIALISED PETROLEUM SERVICES
GROUP LTD.**

WS01406445-17-

WS01405073